IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID ANDREW NEZBEDA and
HEIDI CHRISTINE NEZBEDA,

      Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE
CORPORATION (LIC), GILLIAN
O'NAN, MARK EDWARD
MCRORIE, ROBERT DALE
LEONARD, II, MELISSA
BRICKEY, CLAY O'DANIEL,
DAVID EDWARD OLES, SR.,
LESLIE O'NEAL, COBB COUNTY
GOVERNMENT, WILLIAM
BUCHANAN, JENNIFER
ROBERSON MCKWEON, formerly
known as Jennifer Roberson
Nezbeda, ARTIMES GROUP, LLC,
REGINALD LOVELACE, COBB
COUNTY POLICE DEPARTMENT,
COBB COUNTY  SHERIFF
DEPARTMENT, ELLARETHA
COLEMAN, also known as Ellaretha
Jones, JAMIE MINICH, COBB
COUNTY TAX ASSESSORS
OFFICE/COBB COUNTY TAX
COMMISSIONER'S OFFICE,
WESTSIDE ELEMENTARY
SCHOOL, NORTH POINT
PSYCHOLOGY, COBB COUNTY
ADULT DETENTION CENTER,
COBB COUNTY CLERK OF

CIVIL ACTION FILE

NO. 1:17-CV-1261-MHC

**SUPERIOR COURTS, MARK
LIVELY, RJMW, INLINE
CONSULTING, DOUGLAS WHITE,
WHITE HEART ASSOCIATES,
LLC, and JUDICIAL
QUALIFICATIONS COMMITTEE,**

  **Defendants.**

### ORDER

On December 5, 2016, Magistrate Judge Janet F. King entered an Order

[Doc. 2] permitting Plaintiffs to proceed *in forma pauperis* in this action.  The case

was then referred to the undersigned for a 28 U.S.C. § 1915(e) frivolity

determination.

## I. STANDARD OF REVIEW

A federal court is required to dismiss an *in forma pauperis* complaint at any

time if the court determines that the action is (1) frivolous or malicious, (2) fails to

state a claim on which relief may be granted, or (3) seeks monetary relief against a

defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2).  A claim is

frivolous "where it lacks an arguable basis either in law or fact."  Neitzke v.

Williams, 490 U.S. 319, 325 (1989).  A complaint may be dismissed for failure to

state a claim if it does not plead "enough facts to state a claim to relief that is

plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007).

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41. 47 (1957)). A plaintiff, however, may not simply plead facts in a complaint sufficient to find that a claim to relief is merely conceivable; instead, the complaint must set forth "enough facts to state a claim to relief that is plausible on its face." Id. at 570. The Supreme Court has also instructed that

> [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleader is entitled to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (quoting FED. R. CIV. P. 8(a)(2)) (other citations omitted).

The Court notes that, because Plaintiffs are proceeding *pro se*, their "pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998). However, this "does not give a court license to serve as [her] de facto counsel . . . , or to rewrite an otherwise deficient pleading in

order to sustain an action." Powers v. Avondale Baptist Church, 393 F. App'x

656, 657 (11th Cir. 2010) (internal quotation marks omitted).  Moreover, nothing

in the leniency accorded a pro se filing excuses a plaintiff from compliance with

the threshold requirements of the Federal Rules of Civil Procedure. See, e.g.,

Trawinski v. United Techs., 313 F.3d 1295, 1297 (11th Cir. 2002).

## II.    BACKGROUND

Plaintiffs, appearing *pro se*, have filed a twenty-nine page Complaint against

twenty-eight named defendants.  Compl. [Doc. 3 at 1-29].  The Complaint contains

179 individually numbered paragraphs and incorporates by reference a forty-four-

page "affidavit of fact" containing an additional 190 individually numbered

paragraphs.  Compl.; Aff. of David Andrew Nezbeda dated April 7, 2017 [Doc. 3

at 30-73] ("Nezbeda Aff.").  The allegations in the Complaint are disjointed,

voluminous, and difficult to follow.  Plaintiffs appear to seek redress from a

dispute between Mr. Nezbeda ("Nezbeda") and his insurance company related to a

property damage claim filed in 2014.  The initial controversy with the insurance

company appears to have devolved into numerous additional disputes with other

parties who played various roles in making and assessing the property damage

claim, including his own representatives.  The ever-burgeoning insurance claim

dispute appears eventually to have found its way into a separate, pre-existing

4

custody battle between Nezbeda and his former spouse. The Court will attempt to briefly summarize what it understands to be the factual predicate of Plaintiffs' claims in this case.

### A.   Dispute With Liberty Mutual Insurance Corporation

On January 8, 2014, Nezbeda's home was damaged from water due to frozen pipes. Nezbeda Aff. ¶ 9. He filed a claim with his insurance company, Liberty Mutual Insurance Corporation ("LIC"), which Nezbeda alleges was denied on January 25, 2014. Id. ¶ 13.[1] On February 6, 2014, Nezbeda retained attorney Defendant Clay O'Daniel to represent him with regard to his claim against LIC. Id. ¶ 14. At the suggestion of O'Daniel, Nezbeda hired insurance adjuster Defendant Mark Edward McRorie to represent him in the process of getting an appraisal of the damages to his home. Id. ¶ 31. On October 20, 2014, Nezbeda sent a second formal demand letter to LIC for full payment on his claim. Id. ¶ 28.

LIC appears to have paid Nezbeda at least $103,500.00. Id. ¶ 37. However, Nezbeda contends that LIC's representative, Defendant Mark Lively (hired by LIC as their appraiser, id. ¶ 32), and McRorie reached an agreement with regard to the

---

[1] In addition to the January 25, 2014 property loss claim, it appears that Nezbeda also filed a theft claim with LIC on July 23, 2014. Id. ¶ 174. Nezbeda does not provide any further information about the theft claim and it is not apparent if it is meant to be a part of the above-styled complaint.

amount of property loss on December 9, 2014, in the amount of $195,000.00. Id.

¶ 34. Based on this alleged agreement, Nezbeda appears to contend that he is still

owed at least $91,500.00. Id.

The full payment of his property loss claim is not Nezbeda's only grievance

against LIC and its representatives. Defendant Jamie Minich is an employee of

LIC who is alleged to have come to Nezbeda's property on January 24, 2014, to

take photographs and stayed there without Nezbeda's permission. Id. ¶¶ 11-12, 22.

Defendant Reginald Lovelace is an employee of LIC who is alleged to have broken

into Nezbeda's property on April 14, 2014, and taken photographs of the interior

and exterior of the home. Id. ¶¶ 17-19. Nezbeda appears to have filed a police

report related to Minich's and Lovelace's entry onto his property. Id. ¶ 22.[2]

Nezbeda also claims that LIC and Lovelace were complicit in computing false and

incorrect estimates from October through December 2014 and unlawfully

involving themselves in the appraisal process. Id. ¶¶ 32, 35.

At some point after Nezbeda received the "partial payment" from LIC,

O'Daniel notified Nezbeda of the outstanding bill Nezbeda owed for the work

O'Daniel performed on Nezbeda's behalf. Id. ¶¶ 37-38. At some point thereafter,

---

[2] Nezbeda contends that when he later spoke to the Cobb County Police
Department on August 16, 2016, the police department denied that there was ever
an investigation into Lovelace. Id. ¶ 134.

McRorie called Nezbeda to tell him that McRorie and O'Daniel could get the remainder of Nezbeda's claim from LIC (presumably $91,500.00) if Nezbeda paid the bills McRorie and O'Daniel had submitted to Nezbeda for the work they already performed on Nezbeda's behalf. Id. ¶ 39. Subsequently, McRorie and O'Daniel are alleged to have made constant harassing communications and threats to Nezbeda demanding payment for the services they performed. Id. ¶¶ 39-41, 45, 70.[3]

### B.   Custody Dispute

Jennifer Roberson McKweon is Nezbeda's former wife, from whom he was divorced in October of 2011. Compl. ¶ 11; Nezbeda Aff. ¶ 4. Nezbeda alleges that

---

[3] There are multiple defendants named in the Complaint who appear to have had some role in the appraisal process related to Nezbeda's claim against LIC, but it is not evident why they have been named as defendants. For example, Nezbeda's Complaint lists Defendant RJMW (apparently Reid, Jones, McRorie & Williams, Inc.), which appears to be an entity that provides independent adjustment services. Compl. ¶ 24. Apart from the fact that it appears that individually named Defendant McRorie is a named partner in RJMW, the Complaint does not explain why RJMW is a defendant in this case. Additionally, Defendant Inline Consulting appears to be a consulting firm specializing in property damage restoration and reconstruction recommendations which employed individually named Defendant Lively at the time of the facts giving rise to the Complaint. The Complaint does not explain why Inline Consulting is a defendant in this case. In addition, Defendant Douglas White is an insurance appraiser employed by White Heart Associates, LLC, Compl. ¶¶ 26-27, who is alleged to have participated in the agreed-upon property loss claim amount of $195,000.00 reached between Defendants Lively and McRorie. Nezbeda Aff. ¶ 34. The Complaint does not otherwise explain why White and White Heart Associates, LLC are defendants in this case.

McKweon "stole" their child and moved to Georgia and that he moved to Georgia

so that he could spend more time with the child. Nezbeda Aff. ¶¶ 2, 6. Upon

relocating to Georgia on May 7, 2012, Nezbeda filed a petition to modify their

child custody arrangement in Cobb County, Georgia. Id. ¶ 6. As a part of the child

custody proceeding initiated by Nezbeda, the court issued a temporary order

granting Nezbeda visitation rights until a final order could be entered. Id. ¶ 7. The

temporary order contemplated that a guardian *ad litem* would be appointed for the

child. Id. McKewon hired an attorney, Defendant Leslie Dean O'Neal, to

represent her in the child custody proceeding. Id. ¶ 27. Nezbeda hired Defendant

David Oles to represent him in the custody dispute. Id. ¶ 75.

On January 8, 2015, the judge in the custody proceeding, Defendant Robert

Dale Leonard, II, appointed Defendant Gillian O'Nan as the guardian *ad litem*. Id.

¶ 43. The same January 8, 2015, order directed Nezbeda to submit to drug testing,

including a hair follicle screening. Id. ¶ 47. Nezbeda reported to Defendant

Airtimes Group, LLC ("Airtimes"), for a hair follicle screening on January 20,

2015. Id. ¶ 53. The results, which Nezbeda contends were "adulterated," came

back positive for drugs in Nezbeda's system. Id. ¶¶ 53, 55. Nezbeda returned to

Airtimes soon thereafter to take an additional urine screening, which he contends

showed no drugs in his system. Id. ¶ 56. Nezbeda had an additional hair follicle

8

test performed at another facility, which indicated that he had no drugs in his system. Id. ¶ 67. Nezbeda alleges that he was periodically required to submit for drug tests that were unnecessary, expensive, and time consuming. Id. ¶¶ 70, 87, 89, 176.

O'Neal is alleged to have contacted McRorie (Nezbeda's insurance adjuster from the dispute with LIC), to be a character witness in the custody proceeding. Id. ¶ 71. On or about March 20, 2015, McRorie threatened Nezbeda that he was going to cooperate with O'Neal and use influence McRorie had with Judge Leonard (with whom McRorie was acquainted through a family member) if Nezbeda did not pay for the work McRorie performed on behalf of Nezbeda related to the dispute with LIC. Id. ¶¶ 71, 76. Nezbeda alleges that McRorie eventually provided false information to the guardian *ad litem* (O'Nan) and appeared at one of his child custody hearings. Id. ¶¶ 76, 78, 81-82. Nezbeda contends that he reported McRorie to the police related to an alleged attempt to extort him. Id. ¶ 96. In a subsequent conversation with the Cobb County Police Department on August 16, 2016, the police department denied that there was ever an investigation into McRorie. Id. ¶ 134.

The crux of Nezbeda's allegations relating to the custody dispute appear to be based upon a wide-reaching conspiracy Defendants are alleged to have engaged

9

in to Nezbeda's detriment.  For example, Nezbeda alleges that McKweon and her attorneys, including O'Neal, used the court system as a tool to personally attack Nezbeda.  See, e.g., id. ¶¶ 5, 7, 41.  He contends that McRorie and O'Daniel involved themselves in the custody dispute in an effort to get Nezbeda to pay money that allegedly was owed.  Id. ¶ 33 ("Defendants Odaniel and McRorie started their scorched earth campaign against Plaintiff and they used their personal ties with Defendant Leonard to the detriment of his custody case.").  Nezbeda further alleges that Judge Leonard "allowed and encouraged" O'Neal and O'Nan "to constantly and illegally invade [his] privacy by giving unlimited power to consider every single aspect of [his] life through financial records, travel records, [his] wife's divorce from her ex-husband, and even her children's parenting plan."  Id. ¶ 80.  Nezbeda's affidavit is replete with numerous convoluted allegations attempting to show that Defendants McKweon, O'Neal, O'Nan, McRorie, and Leonard conspired against him in the custody proceeding.  See, e.g., id. ¶¶ 86-89, 91, 100-04, 108, 141, 160, 167, 175-79, 184, 187.[4]

---

[4] Curiously, Nezbeda admits that on August 15, 2016, he attended a barbecue with O'Neal, O'Nan, Leonard, and their spouses.  Id. ¶ 131.

On August 21, 2015, an order was entered in the custody proceeding revoking Nezbeda's right to overnight visitation with his son. Id. ¶ 103.[5] Nezbeda contends that at some point in the proceedings he was permitted to have supervised visits, but on August 27, 2016, he was denied visitation for a lack of having a supervisor. Id. ¶ 145. Nezbeda's Affidavit contains numerous allegations detailing the difficulty he encountered with seeing his son because of the apparent requirement that the visits be supervised. See, e.g., id. ¶¶ 168-73, 175, 182-84. At some point Nezbeda went to his son's school, Westside Elementary School, to obtain a copy of his son's school records, but was denied access to any records. Id. ¶ 152. According to his own allegations, this was corrected by September 14, 2016, when Nezbeda acknowledges that he was permitted to obtain a copy of the records. Id. ¶ 153.

On August 19, 2016, Nezbeda filed a motion to disqualify Judge Leonard and "impeach" O'Nan as guardian *ad litem*, and a corresponding complaint with

---

[5] Defendant Ellaretha Coleman, also known as Ellaretha Jones, is a lawyer with E. Jones & Associates, LLC. Compl. ¶ 16. Nezbeda contends that he had to go through Coleman to reach O'Nan after he was incarcerated in order to convince O'Nan to come inspect his home so that he could regain overnight visitation rights with his son. Nezbeda Aff. ¶ 118. Plaintiffs' Complaint does not explain why Coleman is a defendant in this case.

the Georgia Judicial Qualifications Committee. Id. ¶¶ 137-39.[6] Nezbeda alleges

that Judge Leonard, through his staff attorney, Defendant Melissa Brickey,[7]

threatened to sue Nezbeda unless Nezbeda sealed the motion for disqualification.

Id. ¶ 143. Nezbeda contends that the Judicial Qualifications Committee did a "sub-

par investigation into the abuses [he] complained about." Id. ¶ 190. Nezbeda

alleges that O'Nan filed a motion to hold him in contempt for his failure to pay for

her services as guardian *ad litem*. Id. ¶ 91.

### C.   Nezbeda's Incarceration

At some point in the custody proceeding Judge Leonard ordered Nezbeda to

sit for a psychological evaluation to be performed by Defendant William

Buchanan. Id. ¶¶ 95, 112. Nezbeda alleges that because Nezbeda failed to sit for

the evaluation, on December 8, 2015, he was "incarcerated by Defendant Judge

---

[6] It is not clear from Plaintiffs' Complaint why the Cobb County Sheriff's
Department is a named defendant in this case. The lone factual allegation in
Nezbeda's affidavit mentioning the Sherriff's Department relates to an open
records request he contends he made with the office on or before October 25, 2016.
Id. ¶ 161. Nezbeda contends that the Cobb County Sheriff's Department
responded to his request, informing him that they are not the correct entity from
which to request video tapes of court proceedings. Id.

[7] Defendant Melissa Brickey is alleged to be the staff attorney for Judge Leonard.
Compl. ¶ 5. Apart from the allegation that Brickey is privy to allegedly unlawful
acts of Judge Leonard, Nezbeda Aff. ¶ 85, and somehow communicated the threat
that Judge Leonard was going to sue Nezbeda, id. ¶ 143, Plaintiffs' Complaint does
not explain why Brickey is a defendant in this case.

Robert D. Leonard for an indefinite sentence." Id. ¶ 113. Nezbeda alleges he was incarcerated for a total of nine days. Id. ¶¶ 113-14, 125.

While he was incarcerated at the Cobb County Adult Detention Center, Nezbeda contends that he was denied his regular prescriptions, causing him to go into withdrawal and, at the same time, was prescribed and given a variety of other medications by doctors he never saw. Id. ¶ 119. He alleges that these medications produced the following side effects: "pain, chills, diarrhea, loss of bladder control, severe dizziness, loss of memory, slurred speech, dry mouth, confusion, clumsiness, severe headache, loss of appetite, anxiety, mood changes, and lack of concentration." Id. While incarcerated at the Cobb County Adult Detention Center, Nezbeda lost seventeen pounds, was denied access to the "store," and forced to miss meals. Id. ¶ 126.

It was while Nezbeda was experiencing all of these symptoms on December 11, 2015, that he sat for the psychological examination performed by Buchanan. Id. ¶¶ 119, 122. Buchanan did not complete the examination on December 11, but instead had his associate complete it on December 13, 2015. Id. ¶¶ 122-24. Nezbeda contends that Buchanan's report was a "disgrace to the science and was simply a document forged to benefit all Defendants in the case." Id. ¶ 135. Despite Buchanan's examination being completed on December 13, 2015,

13

Nezbeda was not ordered to be released until December 18, 2015. Id. ¶ 125. Nezbeda retrieved a copy of Buchanan's psychological examination on August 16, 2016, from Buchanan's practice, North Point Psychology. Id. ¶ 132. Nezbeda contends that an employee of North Point Psychology apologized for not mailing the report to him when it was mailed to O'Nan and O'Neal. Id.

Nezbeda alleges that his own representative, Defendant Oles, had a conflict of interest with regard to Buchanan and that Oles maliciously and intentionally failed to take certain actions with regard to his custody proceeding, providing further evidence of Oles's bias against Nezbeda. Id. ¶¶ 95, 98-99, 105, 107. He also alleges that on October 28, 2016, Nezbeda received a threat of a lawsuit from Oles if Nezbeda did not pay Oles the money owed for services Oles rendered on behalf of Nezbeda. Id. ¶ 163.

### D.    Attempted Tax Sale of Property

On August 30, 2016, Nezbeda found a "notice of tax sale" sign posted in his front yard. Id. ¶ 149. He contends that he was not provided any notice from the Cobb County Tax Commissioner's Office of the sale prior to this date. Id. Subsequently, Nezbeda contends that the Cobb County Tax Assessors Office gave him notice that the taxes that were due on his property were revised downward by

14

approximately $2,000.00.  Id. ¶ 166.  Nezbeda alleges that the downward revision

resulted in a refund that he was due to receive.  Id.[8]

## III.   DISCUSSION

### A.   Shotgun Pleading

After a careful and thorough review, the Court concludes Plaintiffs'

Complaint is a shotgun pleading.  The Eleventh Circuit has routinely found that a

shotgun pleading is the antithesis of the type of pleading required by Federal Rules

of Civil Procedure: to wit, a "short and plain statement of the claim."  FED. R. CIV.

P. 8(a)(2); see Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp., 305

F.3d 1293, 1295 n.9 (11th Cir. 2002) (noting that the Eleventh Circuit "has

addressed the topic of shotgun pleadings on numerous occasions . . . , often at great

length and always with great dismay.").[9]

---

[8] Plaintiffs' Complaint does not explain why the Cobb County Tax Assessors
Office is listed as a defendant in this case.  The allegation that the Cobb County
Tax Assessors Office notified Nezbeda of the downward revision is the only
allegation involving the Cobb County Tax Assessors Office in Nezbeda's factual
affidavit.  There are no allegations related to the Cobb County Government and the
Cobb County Clerk of Superior Courts in Plaintiffs' Complaint.

[9] The court in Strategic Income Fund gave a history of cases condemning the
practice of shotgun pleading.  305 F.3d at 1295 n.9 (citing Byrne v. Nezhat, 261
F.3d 1075, 1128-34 (11th Cir. 2001) ("Shotgun pleadings . . . impede[] the due
administration of justice and, in a very real sense, amount[] to obstruction of
justice.") (internal citation omitted); Magluta v. Samples, 256 F.3d 1282, 1284-85
(11th Cir. 2001) (refusing to address and decide serious constitutional issues on the

The Eleventh Circuit has explained why shotgun pleadings are viewed with such

disfavor:

> [T]he aggregate negative effects of shotgun pleadings on trial courts
> have been noted with great concern by this court.  See, e.g., Byrne,
> 261 F.3d at 1131 ("Shotgun pleadings, if tolerated, harm the court by
> impeding its ability to administer justice.  The time a court spends
> managing litigation framed by shotgun pleadings should be devoted to
> other cases waiting to be heard."); Cramer v. Fla., 117 F.3d 1258,
> 1263 (11th Cir. 1997) (noting that "shotgun pleadings . . . exact an
> intolerable toll on the trial court's docket"); Ebrahimi v. Huntsville
> Bd. of Educ., 114 F.3d 162, 165 (11th Cir. 1997) (per curiam)
> ("Shotgun notice pleadings . . . impede the orderly, efficient, and
> economic disposition of disputes."); Anderson , 77 F.3d at 367 (noting
> the "cumbersome task of sifting through myriad claims, many of
> which may be foreclosed by various defenses" that judges face in
> connection with shotgun pleading).

Strategic Income Fund, 305 F.3d at 1295 n.10.

The term "shotgun pleading" refers to pleadings "calculated to confuse the

'enemy,' and the court, so that theories for relief not provided by law and which

---

basis of a "quintessential 'shotgun' pleading of the kind [this court has]
condemned repeatedly, beginning at least as early as 1991" because "it is in no
sense the 'short and plain statement of the claim' required by Rule 8"); Anderson
v. Dist. Bd. of Trs. of Cent. Fl. Comm. Coll., 77 F.3d 364, 366 (11th Cir. 1996)
("[Plaintiff's] complaint is a perfect example of 'shotgun' pleading in that it is
virtually impossible to know which allegations of fact are intended to support
which claim(s) for relief.") (internal citation omitted); Pelletier v. Zweifel, 921
F.2d 1465, 1518 (11th Cir. 1991) (describing "quintessential shotgun pleadings"
complete with "rambling recitations" and "factual allegations that could not
possibly be material" that force the "district court [to] sift through the facts
presented and decide for [itself] which were material to the particular cause of
action asserted")).

can prejudice an opponent's case, especially before the jury, can be masked . . . ."

Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir.

2015) (citation and quotation omitted).  Broadly speaking, there are four types of

shotgun pleadings:

> The most common type . . . is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint.  The next most common type . . . is a complaint that . . . is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.  The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief.  Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.   The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

Weiland, 792 F.3d at 1321-22 (citation and footnote omitted).  The Court finds

Plaintiffs' Complaint exemplifies the first and second type of shotgun pleading by

"being replete with conclusory, vague, and immaterial facts not obviously

connected to any particular cause of action" and, ultimately, fails "to give the

defendants notice of the claims against them and the grounds upon which each

claim rests."  See id.

The Complaint "is in no sense the 'short and plain statement of the claim' required by Rule 8 of the Federal Rules of Civil Procedure." Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) (citation omitted). For example, Nezbeda has named no fewer than twenty-eight defendants, but it is not evident from the allegations of the Complaint how any of them are responsible for any of the acts or omissions which form the claims contained within the Complaint. This is a prime example of the type of shotgun complaint that "require[s] the court to sift through rambling and often incomprehensible allegations in an attempt to separate the meritorious claims from the unmeritorious, resulting in a 'massive waste of judicial and private resources.'" Innocent v. Wachovia Mortg. Corp., No. 1:10-CV-03799-RWS, 2012 WL 602129, at *1 (N.D. Ga. Feb. 22, 2012) (quoting PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V., 598 F.3d 802, 806 n.4 (11th Cir. 2010)). Although Nezbeda appears to have provided great detail in the Complaint, due to the incomprehensible nature of the pleading, the Court is unable to discern a factual basis for any of the claims. As such, dismissal of Plaintiffs' entire lawsuit as a shotgun pleading is warranted.

### B.   Subject Matter Jurisdiction is Lacking

Even if the Complaint were not subject to dismissal as a shotgun pleading, the Complaint is subject to dismissal for lack of subject-matter jurisdiction.

Plaintiffs allege that the claims in their Complaint arise under the United States Constitution and, as such, they are presumably attempting to invoke federal question jurisdiction pursuant to 28 U.S.C. § 1331.  See Compl. ¶¶ 28-30.  The Complaint lists claims for the following: (1) deprivation of civil rights; (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (2012); (3) invasion of privacy; (4) intentional infliction of emotional distress; (5) civil conspiracy; (6) tortious interference with family relations; (7) breach of contract; (8) bad faith; (9) extortion/Hobbs Act violation; (10) medical malpractice; (11) wrongful imprisonment; (12) negligence; and (13) slander/libel.

"As a preliminary matter, we must inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." Hernandez v. U.S. Att'y. Gen., 513 F.3d 1336, 1339 (11th Cir. 2008).  "Federal courts exercise limited subject matter jurisdiction, empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution or otherwise authorized by Congress." Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994) (citation omitted).  District courts have original federal question jurisdiction over a case if the case involves a claim that arises under the Constitution, or treaties, or laws of the United States.  28 U.S.C. § 1331.  Plaintiffs bear the burden of affirmatively

19

alleging facts demonstrating the existence of jurisdiction, including "a short and plain statement of the grounds upon which the court's jurisdiction depends." FED. R. CIV. P. 8(a). After carefully reviewing Plaintiffs' Complaint, the Court finds that Complaint is frivolous because it fails to plead facts demonstrating that this Court has subject matter jurisdiction.

Whether federal question jurisdiction exists "is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987); see also Lindley v. FDIC, 733 F.3d 1043, 1050 (11th Cir. 2013). In this case, a review of the record reveals that Plaintiffs have asserted no federal claims. In light of Plaintiffs' *pro se* status, this Court has viewed their Complaint liberally to allege claims pursuant to the following federal statutes: (1) 42 U.S.C. § 1983; (2) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*; and (3) the Hobbs Act 18 U.S.C. § 1951. Even liberally construed, Plaintiff's Complaint fails to state a claim under any of these federal statutes.

### 1.      Purported Violation of Nezbeda's Civil Rights (Count I)

With regard to the claim that Nezbeda's civil rights were violated, Plaintiffs allege that "Defendant Leonard violated [Nezbeda's] right to due process by sua

sponte issuing orders that denied him custody of his minor child," Compl. ¶ 42,

and that

> Defendants deprived Plaintiff of his freedom by improper
> imprisonment and violated rights as afforded to him as a citizen of the
> United States of America and the State of Georgia. Defendants
> deprived Plaintiff D. Nezbeda of his right to life, liberty, and the
> pursuit of happiness when they forced him to undergo damaging
> psychological evaluations while in belly chains and handcuffs, and
> being denied even the most basic of human dignity of restroom breaks
> or food during these eight plus hour long days of mental testing.
> These violations particularly apply to Defendant Leonard, the Cobb
> County Sheriff's Office, Buchanan, Cobb Co. Adult Detention Center,
> and North Point Psychology.

Compl. ¶¶ 45-46. Essentially, Plaintiffs' claim for the violation of Nezbeda's civil

rights, construed liberally in a light most favorable to Plaintiffs, can be divided into

three parts: (1) a claim against Leonard for issuing orders which "denied

[Nezbeda] custody of his minor child," (2) a claim against Leonard for ordering

that Nezbeda be incarcerated, and (3) a claim against Leonard, Buchanan, North

Point Psychology, the Cobb County Sheriff's Office, and the Cobb County Adult

Detention Center for ordering and carrying out the psychological examination of

Nezbeda while he was incarcerated. See Compl. ¶¶ 42, 45-46. The Court will

consider each purported claim seriatim.

### a. Claims Against Judge Leonard Are Barred by the Doctrine of Absolute Judicial Immunity

Plaintiffs' claims against Judge Leonard for actions taken in the custody proceeding are barred by the doctrine of judicial immunity. The doctrine of judicial immunity grants judicial officers absolute immunity for "actions taken . . . within the legitimate scope of judicial authority." Rehberg v. Paulk, 566 U.S. 356, 363 (2012); see also Stump v. Sparkman, 435 U.S. 349, 356-57 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.") (quotation and citation omitted). "Judges are entitled to absolute judicial immunity from damages for those acts taken while they are acting in their judicial capacity unless they acted in the clear absence of all jurisdiction." William B. Cashion Nevada Spendthrift Trust v. Vance, 552 F. App'x 884, 885-86 (11th Cir. 2014) (citation and quotation omitted).

In other words, if the court has constitutional or statutory jurisdiction over the subject matter of the proceeding, "[a] judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." Stump, 435 U.S. at 359; Harris v. Deveaux, 780 F.2d 911, 916 (11th Cir. 1986) (holding that the test regarding whether a judge acted in

the "clear absence of all jurisdiction . . . is only satisfied if a judge completely lacks subject matter jurisdiction").

"A judge is entitled to immunity even when the judge's acts are in error, malicious, or were in excess of his or her jurisdiction." Vance, 552 F. App'x at 886 (citation and quotation omitted); see also Pierson v. Ray, 386 U.S. 547, 554 (1967) ("This immunity applies even when the judge is accused of acting maliciously and corruptly"). Further, judicial immunity extends to a judge's purported conspiracy with another party to violate a person's rights in his judicial capacity. See Elder v. Athens-Clarke Cty, 54 F.3d 694, 695 (11th Cir. 1995) ("[T]he allegation that a challenged official act is part of a conspiracy does not in any manner dilute immunity"); Dykes v. Hosemann, 776 F.2d 942, 945-46 (11th Cir.1985) (en banc) (explaining that the mere allegation of a conspiracy with a party to the controversy underlying a judicial act does not strip a judge of immunity for claims relating to that act).

The Supreme Court has established a two-part test for determining whether a judge enjoys absolute immunity for his conduct. Stump, 435 U.S. at 362. The first question is whether the judge, in performing the acts in question, was dealing with the parties in his judicial capacity, and whether the acts were of the sort normally performed by judicial officers. Id. If the answer is yes, then the court must

23

determine the second prong of the test: whether the judge acted in the clear absence of all jurisdiction. Id. 435 U.S. at 359-64; See also Emory v. Peeler, 756 F.2d 1547, 1553 (11th Cir.1985).

Here, Plaintiffs' civil rights claim against Judge Leonard is based on three alleged orders: (1) an order allegedly requiring Nezbeda to sit for a psychological examination; (2) an order allegedly directing the incarceration of Nezbeda for failure to sit for the psychological examination, and (3) an order related to the custody of Nezbeda's child. See Compl. ¶¶ 42-46. Plaintiffs do not plausibly allege that Judge Leonard's orders were made outside his judicial capacity.[10] Nor do Plaintiffs plausibly allege that Judge Leonard did not have jurisdiction over Nezbeda. Because Plaintiffs' allegations all relate to acts taken by Judge Leonard in his judicial capacity, Plaintiffs' claims are barred by absolute judicial immunity. Accordingly, Plaintiffs have failed to state a claim for the violation of Nezbeda's civil rights against Judge Leonard.

### b. Civil Rights Claim as it Relates to Remaining Defendants

---

[10] To the contrary, the only salient facts alleged in this case indicate that Judge Leonard was acting within his jurisdiction as the Judge presiding over the custody proceeding brought by Nezbeda. See Nezbeda Aff. ¶ 8.

24

Although the Complaint purports to state a claim against "all defendants" for the violation of Nezbeda's civil rights, Plaintiffs' Complaint indicates that "[t]hese violations particularly apply to" Judge Leonard, the Cobb County Sheriff's Office, Buchanan, Cobb County Adult Detention Center, and North Point Psychology. See Compl. ¶¶ 40-47. Plaintiffs' Complaint, however, does not allege any facts that any Defendant other than Judge Leonard took any action that resulted in Nezbeda's incarceration and the loss of the custody of his child.

With respect to Plaintiffs' civil rights violation claim against all of the other Defendants, Plaintiffs' claim is based solely on the allegation that Defendants "forced [Nezbeda] to undergo damaging psychological evaluations while in belly chains and handcuffs, and being denied even the most basic of human dignity of restroom breaks or food during these eight plus hour long days of mental testing." Compl. ¶ 46. However, Plaintiffs' allegations related to the psychological evaluation fail to state a constitutional deprivation which can support a claim pursuant to 42 U.S.C. § 1983 against any defendant, including Defendants Buchanan, North Point Psychology, the Cobb County Sheriff's Office, and the Cobb County Adult Detention Center.

Nezbeda has no constitutional right to a custody proceeding free of court-ordered psychological examinations. To the contrary, the Georgia statute

governing child custody proceedings specifically contemplates that such examinations may be required. <u>See</u> O.C.G.A. § 19-9-3 (a)(7) ("The judge is authorized to order a psychological custody evaluation of the family or an independent medical evaluation.") Moreover, "neither a court appointed custody evaluator nor a court-appointed guardian *ad litem* shall be subject to civil liability resulting from any act or failure to act in the performance of his or her duties unless such act or failure to act was in bad faith." <u>Id.</u> Because there is no allegation that the Cobb County Sheriff's Office, Buchanan, Cobb County Adult Detention Center, or North Point Psychology acted in bad faith with regard to the administration of the psychological evaluation, Plaintiffs' claim alleging a violation of his civil rights must fail.

Because Plaintiffs have failed to allege facts that state a claim against any Defendant related to the alleged violation of his civil rights, Count I is **DISMISSED**.

### 2.   RICO (Count II)

Count II of Plaintiffs' Complaint against Defendants O'Nan, O'Neal, Oles, Artimes Group, Northpoint Psychology, Buchanan, Leonard, LIC, Lovelace, Minich, McRorie, and the Judicial Qualifications Committee alleges the violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§§ 1961-68 (2012). As explained below, the allegations in Plaintiffs' Complaint, construed liberally in a light most favorable to Plaintiffs, fail to state a claim under RICO.

RICO primarily targets members of criminal organizations who take over or operate legitimate businesses, but also encompasses "a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 248-49 (1989). RICO provides a private civil action to recover treble damages for injuries resulting from "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Jones v. Childers, 18 F.3d 899, 910 (11th Cir. 1994) (citation and quotations omitted); 18 U.S.C. § 1964(c) (providing that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . .").

As pled, Plaintiffs' RICO count is nothing more than an inartful and unsuccessful attempted recitation of the elements of the cause of action. See Compl. ¶¶ 49-55. Plaintiffs' Complaint does not contain sufficient factual

allegations to establish each of the essential elements of a civil RICO claim.[11] Id.

Plaintiffs simply rely on "the unlawful conduct in the attached affidavit of fact" to

show the pattern of racketeering activity. Id. ¶ 53. Plaintiffs' Complaint requires

the Court to pick and choose which factual paragraphs would support a plausible

RICO claim and the Court finds none.

Simply put, even construed liberally, Plaintiffs' allegations do not establish

conduct of an enterprise or that the enterprise had as a common goal a pattern of

ongoing, continuing criminal racketeering activity. See United States v. Turkette,

452 U.S. 576, 583 (1981) ("The enterprise is an entity, for present purposes a

group of persons associated together for a common purpose of engaging in a

course of conduct."); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1265 (11th

Cir. 2004) ("The continuity element of a pattern of racketeering activity is crucial

to a valid RICO claim in order to ensure that the crime alleged is the sort of offense

that RICO is designed to address — one that is part of a pattern of ongoing,

---

[11] For example, there are no factual allegations in the Complaint to support the purported predicate acts listed in Plaintiffs' Complaint. Compl. ¶ 52. Further, to the extent Plaintiffs are claiming some form of fraud was the predicate act supporting their RICO claim, see Compl. ¶ 52 (vi), Plaintiffs have failed to plead this Count with the requisite level of specificity required of Rule 9(b) of the Federal Rules of Civil Procedure. See Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309, 1316-17 (11th Cir. 2007) (holding that RICO claims based on allegations of fraud must meet the heightened level of specificity standard for pleading set by Rule 9(b)).

continuing criminality or that involves criminality that promises to continue into the future."). Indeed, Plaintiffs' allegations are limited exclusively to Nezbeda's factual predicament and stop short of alleging that Defendants are involved in some sort of ongoing conspiracy as part of their regular way of conducting business. See Jackson, 372 F.3d at 1264 ("RICO targets ongoing criminal activity, rather than sporadic, isolated criminal acts.").

Additionally, Plaintiffs' Complaint does not include any allegations of an enterprise affecting interstate commerce. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Plaintiffs' allegations in Count II fail to state a claim under § 1962(c) because they do not allege the existence of an "enterprise" that was engaged in interstate commerce or engaged in activities which affected interstate commerce.

Because Plaintiffs have failed to allege facts that state a claim against Defendants O'Nan, O'Neal, Oles, Artimes Group, Northpoint Psychology, Buchanan, Leonard, LIC, Lovelace, Minich, McRorie, and the Judicial

29

Qualifications Committee for the alleged violation of RICO, Count II is **DISMISSED**.

### 3. Hobbs Act Violation (Count IX)

The Hobbs Act does not provide a private right of action and Plaintiffs' claim (Count IX) brought pursuant to that statute is therefore dismissed. Marfut v. City of N. Port, No. 8:08-CV-2006-T-27EAJ, 2009 WL 790111, at *9 (M.D. Fla. Mar. 25, 2009) ("[T]he Hobbs Act is a criminal statute that does not provide a private right of action.").

Because Plaintiffs have failed to state a claim upon which relief can be granted for any cause of action under a federal law, this Court lacks subject matter jurisdiction and dismissal of Plaintiff's Complaint is warranted.

## III. CONCLUSION

Accordingly, Plaintiffs' Complaint is subject to dismissal as a shotgun pleading. Even if the Complaint was not subject to dismissal as a shotgun pleading, the Court concludes that dismissal of the Complaint is warranted based on a lack of subject matter jurisdiction because Plaintiffs have failed to state a claim upon which relief can be granted for a cause of action under a federal law. Therefore, the Court finds that Plaintiff's Amended Complaint is frivolous under 28 U.S.C. §1915(e)(2)(B)(ii).

It is hereby **ORDERED** that Plaintiff's Complaint [Doc. 3] is **DISMISSED**
and the Clerk is **DIRECTED** to close this case.[12]

**IT IS SO ORDERED** this 20th day of November, 2017.

MARK H. COHEN
United States District Judge

---

[12] Liberty Mutual Insurance Corporation's Motion to Dismiss [Doc. 6] is **DENIED AS MOOT**.